# CHARLESTON.

## Robinson *v.* West Virginia & P. R. Co.

Submitted January 29, 1895—Decided April 13, 1895.

1. Contributory Negligence — Railroad Company—Negligence.

    An engineer runs his train on a sixteen degree curve, at a high rate of speed for such a curve, and against the express orders to him of the railroad company, requiring him at that place to go slow. The engine, with four cars, leaves the track, whereby the engineer is killed. There is some evidence tending to show that the outer rail of the curve is not higher than the inner one. Outside of mere conjecture, this is all that is known of the cause of the accident. There can be no recovery against the company for negligently causing his death; for it thus appears that, if the lowness of the outer rail was a cause of the accident, his own want of due care, and his violation of orders contributed to cause the same.

2. Evidence—Verdict.

    A verdict based alone on mere conjecture, without evidence to support it, where the rule as to the burden of proof requires some reliable affirmative evidence, should not be permitted to stand.

3. Contributory Negligence.

    Contributory negligence is a bar to the right of recovery.

John Brannon and W. Mollohan for plaintiff in error, cited 36 Neb. 642; 39 W. Va. 366; 59 Ala. 245; 31 N. J. 293; 54 Am. & Eng. R. R. Cases 157; Patterson R. Accidents, § 284; 44 Am. & Eng. R. R. Cases, 610; 54 Am. & Eng. R. R. Cases, 328; 2 Am. St. Rep. 193.

W. B. McGary for defendant in error, cited Wood Mas. & S. §§ 327, 329, 438; Bailey's Master's Liability for Injuries to Servants, 1-7, 449, 457; Patterson on R. R. Accidents, §§ 284, 285, 308, 309, 315: 27 W. Va. 146; 100 U. S. 213; 81 Va. 71; 83 Va. 519; 24 W. Va. 37, 52, 54; 32 Mich. 510; 11 W. Va. 14, 16, 30; 17 W. Va. 214-15; 25 W. Va. 570; 17 W. Va. 190; 16 W. Va. 307; 31 W. Va. 142, 143; 35 W. Va. 390; 28 W. Va. 610-618; 37 W. Va. 502; 36 W. Va. 397; 38 W. Va. 206;

15 S. W. Rep. 970; 106 U. S. 700; 21 Am. St. Rep. 107; 49 N. W. Rep. 655; 14 Am. & Eng. Enc. Law, 831, 871; Beach Contributory Neg. § 54.

HOLT, PRESIDENT:

William Robinson, plaintiff's intestate, was a locomotive engineer on defendant's railroad, running from Weston south to Braxton C. H., and had been for three years next preceding the lamentable accident which caused his death, on the 10th day of December, 1892. On that day he started to run engine No. 1 and twelve empty freight cars from Weston to Sutton. At the Bendale sixteen degree curve, one and one-half miles from the starting point, while running at the forbidden rate of speed of about twenty miles an hour, the train and four cars left the track, killing the engineer Robinson, and crippling badly his fireman, William Byers.

There was evidence tending to show that on this curve, at or near where the train ran off on the outer side, the rail on that side was not higher than the inner rail.

There was a verdict for the plaintiff for four thousand dollars. A motion for a new trial was overruled, judgment rendered on the verdict, and from that judgment this writ of error was awarded.

It is the personal duty of the railroad company, no matter by whom it may be or is to be directly performed, to provide a reasonably proper and safe railroad track, machinery, and other suitable means and appliances, and maintain and keep them thus reasonably safe, and also reasonably fit and proper fellow servants. The servant takes upon himself the risks incident to the employment. A servant having knowledge of danger about him must use diligence and care in protecting himself from harm, and not willfully encounter dangers which are known to him. Neither can he recover if his injury was the direct result of his own disobedience of orders. In the case given, the mere fact of the accident creates no presumption of negligence on the part of the company. That must be done by affirmative testimony, and the burden of such proof is on the plaintiff; and, if it thereby

also is made to appear that the fault of the decedent contributed directly to the result, the right to recover does not arise; but otherwise the contributory fault and negligence of the plaintiff's intestate is matter of defense, and proof thereof must come from the defendant. Mere conjecture alone can not supply the place of the proof required. To believe on conjecture and to conjecture without evidence will not do. If there is no evidence in any fairly appreciable degree tending to prove defendant's negligence, then the court, on motion, should instruct the jury to find for the defendant; and the court must decide when the case calls for such instruction, for to that extent it is a question of law arising out of the testimony; but if in the opinion of the court the evidence tends in a fairly appreciable degree, not by a mere scintilla, to prove negligence on the part of the defendant, then the question should be submitted to the jury. If the verdict be for the plaintiff, and it is without evidence in the above sense, on some essential point, or it manifestly appears that there is a clear and decided preponderance of evidence against the finding of the jury, then the verdict should be set aside, and a new trial awarded; for, under our present statute, all the evidence must be considered.

The contention of the plaintiff is that the verdict is justified because it was made to appear that the railroad company failed to provide the decedent with a reasonably safe and proper engine, or a reasonably safe and proper track, at the Bendale curve. The defendant contends that plaintiff fails to make out his case on either ground, or to show by evidence, in any fairly appreciable degree of convincing effect, that defendant was negligent in any respect, and to put the cause of the accident or how it occurred on any ground higher than mere conjecture; and that conceding this to be the proven cause, then it appears by the uncontradicted testimony of his fellow servants who were on the train, that he ran it on this sharp curve, which he well knew, at a speed of twenty miles an hour, whereas he was warned of the character of the curve, and expressly told by those whose duty it was to command, to be careful and not run it (the Bendale curve) at a higher speed than about eight miles an hour.

1. Was the engine a reasonably safe and proper one? The machinist in the shop who brought out engine No. 1 for the trip, and inspected it and carefully examined it at the time and for the occasion, says it was in good condition. So also, the pony truck under the engine which leads it. The lead wheels of the engine were new and unworn, not having seen more than two months' service, at the longest, and presumably had not lost their flare. He appears to be a capable man of experience in such matters. Another engineer, who knew No. 1 well, saw it that day. Says No. 1 was the best of three engines at that point, and had nothing wrong with it. In fact, just after the accident it seems to have been in working order, except a flange of a wheel was partly bro-, ken off by what appeared to be a fresh, bright break. To this nothing in contradiction is shown, except that No. 1 was an old engine, which at some former time had been in a wreck, whereby the pilot had been broken off; but it had undergone many repairs and substitution of parts, and was at the time in question a good engine, in good running order, "and if properly managed, could have handled the train of empties safely," using the language of one of the brakemen on the train at the time of the accident.

2. Was the accident caused by an unsafe track at Bendale curve? It is a sixteen degree curve; that is, one with a radius of three hundred and fifty eight feet. Is such a curve, on such a road, at an exceptionally sharp degree, negligence *per se?* We are not so informed by any testimony in the cause; and it is not matter of general knowledge, especially when the company, as in this case, puts its finger on the very place, telling the engineer: "Run slow here; do not exceed the rate of eight miles." So the rules of the company prescribed. The decedent was an engineer on the road of two or three years' standing, and knew the curve well, and it was his duty to use diligence and care to protect himself from harm.

But it is said the outer rail is not five inches higher than the inner one, as it should be, and this, in so sharp a curve, caused the accident. On this point plaintiff introduced the testimony of a civil engineer of some railroad experience

during several years, who had occasion to pass along close to the curve once or twice a week for some six weeks, who noticed the track during the week preceding the accident. He says that the rail on the outside of the track was too low; that he noticed a place where the wheels were climbing and cutting off the fish-bar bolts; that these bolts had the appearance of having been partially cut off by the flanges of the engine, and had been taken out and replaced two or three times; that the outer rail he supposed to be five inches too low, and he considered it to be in such condition that an accident was liable to occur at any time, from the fact that the outside rail was too low, and he made that remark to another witness, who was passing the place with him some two or three weeks before the accident.    But this is met on the other side by the testimony of Rebrook, the supervisor of the road, who had been engaged in laying and repairing track on that road and the Baltimore & Ohio for seventeen years. Had worked as a section hand, section boss, and on up to the position he now held as supervisor of the road from Weston to Sutton, and to Camden-on-Gauley, the southern terminus.    Had laid the track in question.    Had that day, not more than two hours ahead of this train, examined the track on the Bendale curve, and found it then all right, in good repair, and safe condition, and was on the road six hundred yards south of the place of the accident when it occurred. "The track was then in fairly good condition.    I examined it. That was a part of my duties."    In comparing the testimony of these two witnesses on this point, Mr. Gibson does not locate the low place in the outer rail as the place where the engine left the track, but as some point on this curve, and it was two or three days before the accident.    Rebrook says the outer rail was given an elevation of five inches at that place.    Has been kept up to just about that ever since, and to see that that was done was a particular part of his business, and on the day of the accident, at the place of derailment, it had about that elevation.    He says: "On that day the track was perfectly safe to run at any rate of speed that the curve would admit of.    Of course, it was a sharp curve, and you could not make any great rate of speed over it."

Here the question occurs, what was the safe and proper rate of speed? Rebrook says that he requested Mr. Lane, the assistant superintendent to notify all trainmen to run there at a rate not to exceed six miles an hour. He did not himself mention any particular speed to Engineer Robinson. He simply told him to be careful. He cautioned Robinson twice in regard to running around this Bendale curve, and several others. "I told him it was a very sharp curve, and a dangerous place, and he ought to be very careful in running around it." Robinson had run engines on this road as engineer during a period of two or three years. He was a good engineer, but was inclined to run too fast, as all who knew him and speak on the subject testify. But what were the direct proximate causes or cause, is a matter of inference or matter of conjecture. A. W. Marsh, a brakeman who was on the train at the time, says: "We were running over the maximum speed when we went off. It would have run without steam, being down grade, just before the curve was reached; but he used steam on the down grade, and was running anyhow between eighteen and twenty miles an hour when she jumped the track." J. P. Fox was the conductor on the train. He says that up to a point within four hundred or five hundred or six hundred feet of the place of the accident, he was making ten or twelve miles an hour. When he started down grade, he seemed to be still pulling the throttle open more, and gathered more speed as he went down the grade. "As near as I can judge, he was running twenty miles an hour when the engine jumped the track." William Byers, the fireman, who was badly hurt in the accident, says that at the time the speed was about fifteen miles an hour. Rebrook was within five hundred or six hundred yards of the train, and in sight until it turned into the curve where the accident happened, and could tell that the train was running down grade with steam on. That he was not running at this forbidden and dangerous rate of speed at the time there is nothing in this record that proves or tends to prove, but, on the contrary, the inferences tend to confirm these uncontradicted witnesses. An elevation of the outer rail of one and one-fourth inches, not observable by one measuring

with his eye, might have been enough for a speed of ten miles an hour, and just as safe, perhaps, at that speed, as an elevation of four and one-fourth inches, would have been at a speed of twenty miles an hour.  There can be no escape, as it appears to me, from the conclusion, under this evidence, that if the lowness of the outer rail was one of the causes, the fast speed, in violation of explicit orders, at least contributed directly to bringing about the accident, and that would be a bar to the right of recovery.  The experts who went upon the ground at once for the purpose of examining and remedying the condition of affairs, and ascertaining the cause of the accident, gave their testimony.

The assistant superintendent, a man of eighteen years experience in such matters, was on the ground as soon as he could get there; about the first one from Weston on the ground.  He says: "I examined everything connected with it, so as to form an opinion as to the cause of the accident. The broken parts of the wheels were some ten or twelve feet from where the wheels left the track, so that the flanges seemed to have broken after the wheels were off the rails. There were no flaws in the wheels.  The engine was all right.  She had gone through a severe test.  Had run nearly one hundred yards against the rocks.  My theory was that the train had left the track on account of something being on it, or that the engineer had been running at a very rapid rate of speed, and the momentum caused the train to run too fast.   It was regarded as being a severe curve and on that account we prescribed extra rules on slow running there, and considered it necessary that a train should run slowly there, not only on account of the curve, but also on account of the county road.  Engineers were cautioned to run very slowly, and the instruction at one time was not to exceed eight miles per hour round that curve."   After putting all the facts together as best he could upon the ground, he gives the above as his probable inference, founded on evidence too defective to enable him to give us anything beyond his conjecture as to the probable cause or causes of the accident; and the case seems to be left by the evidence in that condition.   There is certainly nothing to

fix upon the defendant any liability for the accident; for if the lowness of the outer rail was a cause, the rapid and forbidden rate of speed of the engineer contributed to bring it about. No reasonable theory of the evidence will support the verdict.

Therefore, if we can not say that a sixteen degree curve is negligence *per se,* we must say that this verdict, tried by this record, is either wholly without evidence on the essential point of negligence, or that the fast running against orders contributed to the result; and if it is our place to see that even-handed justice be meted out as near as may be, according to the very truth of the matter before us, a new trial must be granted; and it is so ordered.